WADSWORTH v. BOARD OF SUP'RS OF LIVINGSTON COUNTY et al.

(Supreme Court, Equity Term, Livingston County. September 30, 1908.)

1. COUNTIES (§ 113*)—RECORDS—STATUTES—"COPIES."

Where the committee of the board of supervisors of a county, appointed to take action for making new indexes for deeds in the county clerk's office, contracted with the county clerk for the making of a complete index of all deeds on record in the office between designated years, and the clerk, in making the indexes, examined every record of deeds in his office and made slips, which were copied into the new indexes, and the existing indexes were only used for comparison, the new indexes were not "copies" of existing indexes, within County Law (Laws 1892, p. 1751, c. 686) § 26, empowering the board of supervisors to authorize county officers to make copies of records.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 113.*

For other definitions, see Words and Phrases, vol. 2, pp. 1594, 1595; vol. 8, p. 7619.]

2. COUNTIES (§ 113*)—RECORDS—STATUTES.

The certificate of the county judge or a justice of the Supreme Court, called for by County Law (Laws 1892, p. 1751, c. 686) § 26, empowering the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

board of supervisors to authorize county officers having the official custody of records to cause copies thereof to be made and certified for public use, providing that the work shall not be ordered until the county judge or a justice of the Supreme Court, after examination, shall certify that the work is necessary for the safety and security of the public records, must be in writing.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 113.*]

3. CONTRACTS (§ 125*) — CONTRACTS FOR COMPENSATION OF OFFICER — "PUBLIC OFFICER"—VALIDITY.

Under Const. art. 3, § 28, prohibiting the granting of any extra compensation to any public officer, and Code Civ. Proc. § 3280, providing that each public officer on whom a duty is expressly imposed by law, must execute the same without fee, except where a fee is expressly allowed, an agreement to pay a county clerk, a "public officer" under Public Officers Law (Laws 1892, p. 1656, c. 681) § 2, for services imposed by law, is invalid on the ground of public policy.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 583½ ; Dec. Dig. § 125.*

For other definitions, see Words and Phrases, vol. 6, pp. 4933–4951; vol. 8, pp. 7737, 7772–7773.]

4. COUNTIES (§ 72*)—COUNTY CLERK—PREPARING INDEXES—COMPENSATION.

A county clerk, preparing new indexes for deeds in his office between designated periods, performs work required by Real Property Law (Laws 1896, p. 615, c. 547) § 265, requiring each recording officer to make proper indexes for instruments recorded in his office, etc., and a contract with the county fixing compensation for such work is ultra vires.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 72.*]

5. COUNTIES (§ 113*) — BOARDS OF SUPERVISORS — CONTRACTS — STATUTORY AUTHORITY—MAKING INDEXES.

County Law (Laws 1892, pp. 1745–1756, c. 686) art. 2, §§ 10–38, providing that the board of supervisors has the care and custody of the corporate property and is charged with the duty of annually auditing charges and accounts against the county, etc., and General Corporation Law (Laws 1892, p. 1804, c. 687) § 11, providing that every corporation has power to acquire by grant, etc., and to hold and dispose of such property as the purposes of the corporation shall require, etc., do not expressly or impliedly authorize the board of supervisors of a county to contract with the county clerk for the making of new indexes for deeds in the clerk's office.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 113.*]

6. COUNTIES (§ 206*)—CLAIMS AGAINST COUNTY—CONCLUSIVENESS.

The powers exercised by boards of audit are judicial; but such boards are limited to the powers conferred on them by statute, and an illegal audit may be attacked directly or collaterally.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 322, 323; Dec. Dig. § 206.*]

7. MUNICIPAL CORPORATIONS (§ 1010*)—POWERS—COMPROMISE.

A municipal corporation has no power to compromise a contract which it had no power to make, unless it is to the extent of eliminating from it the illegal or unauthorized elements.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2181, 2182; Dec. Dig. § 1010.*]

8. COUNTIES (§ 47*)—COUNTY BOARDS—AUTHORITY.

The board of supervisors of a county is the agent of the county, possessing the powers defined by statute, and acts beyond the statute are illegal and void.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 55; Dec. Dig. § 47.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. EVIDENCE (§ 65*)—PRESUMPTIONS—KNOWLEDGE OF LAW.

All persons are presumed to know the law governing a public body and limiting its powers.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 85; Dec. Dig. § 65.*]

10. COMPROMISE AND SETTLEMENT (§ 2*)—NATURE.

Compromise is a species of novation, and it is a condition that neither the original claim nor the subsequent agreement shall be illegal.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 1–4; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 2, pp. 1374–1375; vol. 8, p. 7609.]

11. COUNTIES (§ 196*)—ACTIONS BY TAXPAYER—STATUTES.

An action by a taxpayer to restrain the levying, assessment, and collection of a claim of an individual against a county pursuant to a resolution of the board of supervisors thereof is a statutory action, and is brought to prevent any illegal act of the officers acting for and on behalf of the county, to prevent the waste of its funds.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 196.*]

12. COUNTIES (§ 204*)—CLAIMS—COMPROMISE.

An attempted compromise between a county and a claimant of certiorari proceedings to review the disallowance of the claim, and the audit of the board of supervisors of the claim at a less amount than originally demanded, are void, where the original claim is invalid.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 319; Dec. Dig. § 204.*]

13. FRAUD (§ 1*)—ELEMENTS.

Fraud, in its broad significance, includes all acts and omissions which involve a breach of legal duty injurious to others.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 1–7; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 3, pp. 2943–2954; vol. 8, p. 7666.]

14. COUNTIES (§ 204*)—OFFICERS—COMPENSATION.

A county officer, whose compensation is fixed, cannot rightfully claim anything beyond it; and audit of a claim for which the county is not liable is void for want of jurisdiction.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 204.*]

Action by James W. Wadsworth against the Board of Supervisors of Livingston County and others. Judgment for plaintiff.

Satterlee, Bissell, Taylor & French, for plaintiff.

H. V. Pratt (Walter S. Hubbell, of counsel), for defendant Curtis.

Frank K. Cook, for defendant Board of Supervisors.

BENTON, J. Action by a taxpayer to restrain the levying, assessment, and collection of claim of Henry B. Curtis for $5,470.94 pursuant to a resolution of the board of supervisors passed December 12, 1906. Said Curtis was county clerk of Livingston county from 1899 to 1905. His compensation consisted of fees. On December 7, 1899, the board of supervisors of said county appointed a committee of three, among other things, "to take such action as

they may deem advisable for making new indexes for deeds in the county clerk's office." On March 12, 1900, said committee entered into a written contract, dated that day, with Henry B. Curtis to make and complete a full, proper, and legible index of all deeds on record in the office from the year 1821, inclusive, to 1900. The contract provides specifically how the index should be made and the compensation to be paid Curtis, which was agreed to be at the rate of six cents each "for names of all grantees or grantors or of the wives and husbands of said grantors or grantees in said deeds expressed." This work was to be completed within four years from the date of the said agreement, but by a supplementary agreement, dated January 12, 1903, this provision was waived, and it was agreed that the work should proceed to completion at an average rate per year, but not less than the work theretofore performed under the said contract. The books have been completed. They consist of 20 volumes, and include the period from and including 1821 to 1905. The county provided the necessary books. The claim of Curtis amounted to $14,465.88. He has been paid to apply on said contract $8,057.94.

In November, 1905, Curtis prepared a verified claim and presented it to the board of supervisors for the balance due under said contract, namely, $6,407.94. This claim was referred to a committee, who obtained the opinion of counsel, which opinion was to the effect that the contract was void, and that neither the board of supervisors nor its special committee had power to enter into such a contract or to bind the county of Livingston by such a contract. After various hearings on January 11, 1906, the said board of supervisors duly adopted a resolution rejecting and disallowing entirely the claim so presented, on the ground that the contract was illegal and void. On March 16, 1906, Curtis sued out a writ of certiorari to review such proceedings, and on July 2, 1906, a return was made to such writ, but no further proceedings were taken in court thereunder. In November, 1906, the matter again came before the board of supervisors, and Mr. Curtis appeared and offered to compromise. On January 12, 1906, the board of supervisors passed a voluminous resolution, providing, among other things, that:

"For the purpose of effecting an adjustment of said litigation, and in accordance with said arrangements, that the claim of Henry B. Curtis be and is hereby audited and allowed at $5,470.94, and that an order be issued payable to said Curtis therefor," etc.

In the meantime, and on December 3, 1906, the said board of supervisors passed a resolution directing the county clerk to use the work, and the books have been since, and are still, in use in the county clerk's office of Livingston county. Curtis' term as county clerk expired on December 31, 1904. At that time the work had not been completed. He continued it, and the value of the services rendered after the commencement of the year 1905 was "six hundred and fifty-odd dollars."

Section 26 of the county law (Laws 1892, p. 1751, c. 686) provides for the copying of books and records, and enacts that the board of

supervisors "may authorize county officers having the official custody or control of any such books or records, etc., to cause copies thereof to be made and certified for the public use, and it shall be the duty of such officers to cause the same to be made or certified, whenever by reason of age, exposure or any other casualty, the same should be necessary." Any officers making such transcripts are by the act "to be paid such sum therefore as shall be just, but such payment shall not exceed a sum to be certified by the county judge, or a justice of the Supreme Court of the judicial district, as reasonable therefor. Said board of supervisors shall not accept any pay for said work until the work shall be examined and approved as to its manner and form of execution by such judge or justice, nor shall any board of supervisors order any such work to be done until such judge or justice, after said examination, shall certify to such work being necessary for the safety and security of the public records."

The complaint alleges that these indexes were not copies within the meaning of section 26. This allegation is denied in the answer, and is one of the issues litigated upon the trial. I hold that said Curtis did not make copies of said books or records. The committee was not appointed to cause copies to be made, but to "take such action as they may deem advisable for making new indexes," and the provisions of the contract are consistent with the making of new indexes, and not the copying of the old. Mr. Curtis testified as follows:

"Q. In making the indexes, the new ones, of what use were the old indexes? A. They were used on the two comparisons. Q. What were the comparisons? A. A comparison of the slips made from the records, and the last comparison with the new indexes. Q. In the progression of this work for the making of the new indexes, it then became necessary to examine every record in the office? A. Yes, sir. Q. You would begin with the first volume of deeds and go through it? A. Yes, sir. Q. And then make your new index directly from the deed, did you not? A. No; we made the slips from the records. Q. And the slips were copied into the new indexes? A. Yes, sir; after further comparison with the old indexes. Q. Aside from the names of the grantors and grantees, where the old indexes were correct, to what extent are the new ones copies of the old? A. They are copied from the same records."

It would appear that the old indexes, instead of being a help, from which they copied, gave them additional work, with the two comparisons made for the purpose of obviating every possible mistake. The old records consisted of two parts, each in eight volumes, four grantors and four grantees; the first running from 1821 to 1870, and the second from 1870 on. The books were nearly filled, so that a new set would soon be needed. Furthermore, leaves had become loose in them and errors had been discovered, in that deeds had been omitted or that deeds had been indexed wrong, as, for instance, upon sheriff's sales, instead of the name of the actual owner, whose interest the sheriff sold, some were indexed in the name of the sheriff as grantor. In addition to what was contained in the old indexes, the new set contained the Christian name of the grantor's or the grantee's wife, as the case might be, and also the name of the town in which the real estate was situated. It was never

intended that these new indexes should be certified as copies for public use, nor by reason of age, exposure, or other casualty had it become necessary to make certified copies to be used in the place of the originals with like effect as is the purpose of section 26.

Again, before the appointment of the committee to make the contract, no judge or justice of the Supreme Court, after examination, had certified that such work was necessary for the safety and security of the public records. Judge Coyne, who was then county judge of Livingston county, makes an affidavit in which he said that he made an examination and discussed the matter on several occasions with members of the committee, and that he informed the committee, prior to their report and after the examination, that the work was necessary for the safety and security of the public records, and should be done. I hold that the certification should be in writing. Such should be the reasonable construction of that section of the county law, it seems to me, in order to avoid unnecessary uncertainty, vagueness, and looseness, and there should be a record, in a matter of $14,465.88, of substantial compliance with the section.

A justice of the Supreme Court of this judicial district did certify that the charge made for said contract was reasonable for the work done. It was not within the purview and contemplation of the parties, at the time of the contract or while doing the work, that they were acting under section 26, or were copying the indexes for the purpose of certifying them for the public use. There is no occasion for certifying the indexes; for they are no part of record, or documents or instruments which may be recorded, in the county clerk's office. "There is nothing in the history of the Legislature on the subject of the registration of deeds and mortgages from the earliest time in both England and in this state which tends in the least degree to show that it has ever been supposed that indexing was ever any necessary part of registration." Mutual Life Ins. Co. v. Dake, 87 N. Y. 257, 263.

The matter of providing indexes has been regulated by the statute. A number of general and special acts have been passed by the Legislature upon this subject. The Revised Statutes provided that:

"It shall be the duty of the clerk in each county in the state," etc., "to attach to every book kept in his office in which deeds, and mortgages," etc., "an index arranged in alphabetical order with reference to the pages," etc.

Chapter 313, p. 359, of the Laws of 1826, provided substantially as follows:

"It shall be the duty of the clerks of the several counties in this state, whenever directed by the Court of Common Pleas of any county, to provide proper books for making general indices of all deeds and mortgages recorded or registered in the clerk's office in said county respectively, and to index in alphabetical order all such deeds and mortgages in such manner as shall afford a correct and easy reference to the several books of record in said offices, one of which indices shall contain in alphabetical order the names of grantors or mortgagors, followed by the names of all their grantees or mortgagees, and the other shall contain in like order the names of the grantees or mortgagees, followed by the names of their grantors or mortgagors, which indices of deeds and mortgages shall be entered in separate books," etc.

This act further provides that:

"The clerks should be paid on the audit of the board of supervisors all moneys they may have expended in purchasing such books and twenty-five cents for each and every one hundred names contained in said indices."

Chapter 204, p. 203, of the Laws of 1827, gives the board of supervisors power "to audit and allow to the clerks such further compensation for services rendered under the act of 1826 as the judges of the Court of Common Pleas shall certify to be just and reasonable." This act also provides for general numerical indexes to be provided and to be made and kept by the several counties comprehending any part of the military tract and the Cayuga and Onondago Reservation where an index is not already provided. The act defines what a general numerical index is, in that it shall, under the number of the lot, contain a reference, etc. Numerical and alphabetical indexes have continued to be used in the various counties of this state and are still in use. The indexes in use in Livingston county clerk's office are not numerical indexes within the definition of the statute. They are alphabetical.

In 1843 a general act was passed (chapter 199, p. 253), requiring the clerks of the several counties of the state in those counties in which general indexes of deeds and mortgages had not been made and preserved, etc., to provide proper books for making such general indexes, and to form indexes therein in such manner as shall afford a correct and easy reference to the several books of record in their offices, respectively—one of the books for mortgages, which shall contain in alphabetical order the names of the grantors or mortgagors, followed by their grantees or mortgagees; and the other shall contain in like manner the names of the mortgagees or grantees, followed by the names of their grantors or mortgagors—and further provided that, where indexes had been provided, the clerks shall complete the same by bringing them down to the present time, and in either case the said clerk shall keep the said indexes complete by adding to the list as deeds and mortgages are sent in to be recorded. The county clerk was authorized to charge in his account of necessary expenses the purchase of books and compensation at the rate of 50 cents for each and every 100 names entered in such books; but, as some counties had provided themselves with numerical indexes under the law of 1827, the act of 1843 provided that it should not apply to such counties in this state as now have numerical indexes for deeds or mortgages in the office of the county clerk of said county.

This law of 1843 was repealed entirely when the real property law (Laws 1896, p. 615, c. 547) was enacted, and section 265 of that law takes its place. This section is as follows:

"Each recording officer must provide at the expense of his county, proper books for making proper indexes for instruments recorded in his office, and must form indexes therein, so as to form a correct and easy reference to the several books of record in his office. There must be one set of books for mortgages or securities in the nature of mortgages and another set for conveyances and other instruments not intended as such mortgages or securities. Each set must contain two lists in alphabetical order, one consisting of the names of grantors or mortgagors followed by the names of their grantees or mortgagees, and the other list containing the names of the grantees or mortgagees followed by the names of their grantors or mortgagors," etc.

This section, so far as relates to the preparation of new indexes, shall not apply to a county where the recording officer now has general numerical indexes. This act is silent as to compensation for such services.

The county clerk is a public officer. Section 2, Public Officers Law (Laws 1892, p. 1656, c. 681). So are supervisors. Public Officers Law.

Code Civ. Proc. § 3280, provides that:

"Each public officer upon whom a duty is expressly imposed by law must execute the same without fee or reward, except where a fee or other compensation therefor is expressly allowed by law."

The Constitution of the state (article 3, § 28) provides that:

"The Legislature shall not, nor shall the common council of any city, nor any board of supervisors grant any extra compensation to any public officer, servant, agent or contractor."

"When a statute forbids a person to ask or receive compensation for services in an official or trust capacity greater than prescribed by law, an agreement to pay such extra compensation creates no binding obligation. Such agreement is invalid on the ground of public policy." Carpenter v. Taylor, 164 N. Y. 171, 178, 179, 58 N. E. 53.

"The clerk is the recording officer. He has the custody of all books and records, deeds, etc., deposited in his office in pursuance of the law, and is obliged to attend to their arrangement and preservation." County Law (Laws 1892, p. 1779, c. 686) § 161, subd. 1.

Section 265 of the real property law expressly imposes upon him the duty of providing, at the expense of the county, proper books for making general indexes, and charges him with the duty of forming indexes therein. It was sought upon the agreement between the board of supervisors and Curtis to provide such proper indexes. It was not in the minds of either that they were acting under section 26 of the county law, or that that section need be invoked, probably, until about the time that the affidavits of Judge Coyne and the committee were taken. The old indexes were not the basis upon which the work of making the new was performed. They served no other purpose in the work than that of being used in comparison with the new as a safeguard for greater accuracy.

The law does not contemplate that the work must necessarily be done by the county clerk in person, nor at his expense; for section 265 provides that the books shall be paid for by the county, and section 230, subd. 9, of the county law (Laws 1892, p. 1793, c. 686), makes a county charge of all the moneys necessarily expended by a county officer in executing the duties of his office, in cases in which no specific compensation for such services is provided by law. This subdivision is invoked by Curtis as justifying the compromise resolution of January 12, 1906, because he employed and paid other clerks. It does appear in the evidence that clerks were employed by him; but nowhere does it appear what was paid them, nor is there any evidence in the case from which any computation can be made as to the amount of his expenses. In short, the case is here upon the agreement, and the questions which must conclude its determination are these: Was the contract ultra vires? Was the auditing, wherein balance of the claim was refused in toto,

res adjudicata, so as to become final and binding? Was the agreement valid, independent of the merits of the controversy over the claim?

The county is a municipal corporation. County Law (Laws 1892, p. 1744, c. 686) § 2; General Corporation Law (Laws 1890, p. 1061, c. 563) § 3, subd. 1. Its governing board is the board of supervisors. General Municipal Law (Laws 1892, p. 1732, c. 685) § 1. The jurisdiction of the board of supervisors is statutory. It is defined generally in article 2, §§ 10 to 38, inclusive, of the county law. "The board has the care and custody of the corporate property of the county." Section 12, subd. 1. It is charged with the duty of annually auditing all charges and accounts against the county. Id. subd. 2. "The board of supervisors represents the county in its corporate capacity, and has the power to bind it to the extent conferred by statute. If the acts of the board are challenged, resort must be had to the specific powers enumerated in the statute; but the board is not confined to the exercise of the precise acts contained in the grant of power, but may exercise such incidental powers as are fairly and reasonably necessary and proper to effect or carry out the power that is expressly conferred." Woods v. Board of Supervisors, 136 N. Y. 403, 410, 32 N. E. 1011. No provision of the statute is pointed out or found which expressly in terms authorizes the contract in suit; but it is urged that such power is implied by the specific grants given the board. It must be found in this case that the preparation of the indexes was fairly and reasonably necessary and that the work has been well and accurately performed.

The principle on which the defendant Curtis contends is found in Schenck v. Mayor, 67 N. Y. 44. This was an action to recover the price of blankets and bedding sold the county of New York for the jail, and the court uses this language:

"The power of the county as a body politic can only be exercised through its board of supervisors, and it has power to purchase and hold such personal property as may be necessary to the exercise of its corporate or administrative powers, and to make such orders for the regulation and use of its corporate property as may be deemed conducive to the interests of its inhabitants." Schenck v. Mayor, 67 N. Y. 44, 45.

No expressed authority can be found in the statute authorizing the state to furnish the jail, but the court says:

"There is no doubt the board has authority to do so, in view of its general administrative powers."

Section 11 of the general corporation law (Laws 1892, p. 1804, c. 687) provides that:

"Every corporation has power to acquire by grant, gift, purchase," etc., "and to hold and dispose of such property as the purposes of the corporation shall require subject to such limitation as may be prescribed by law."

Counsel pertinently asks: Why does not this settle the question? The answer, if answer there be, is that the Legislature has definitely prescribed how the result to be obtained here should be reached, and made it the duty of the county clerk to furnish the books at the expense of the county. Therefore by statute the new indexes

were made a county charge, together with the expenses necessarily incurred by the clerk in the preparation. The language of section 265 is broad—clearly, it seems to me, broad enough to cover this case. If it be contended that the law applies only to counties where no indexes have been formed, the answer is at least twofold: (1) It is scarcely possible that in 1896 there were any counties in this state without indexes. (2) The omission of the provisions, contained in the acts of 1826 and 1843, making the acts apply only to counties not having indexes. Moreover, the section in terms covers the case of new indexes.

Again, the language itself is apt and descriptive of the work done by Curtis. He was the recording officer. The indexes in use neither afforded a correct nor an easy reference to the books of record. That statute said he must provide, at the expense of his county, proper books for the making of general indexes and must form indexes therein so as to form a correct and easy reference to the books of record in his office. The conclusion seems to me unavoidable that because, while he need not have done it of his own motion, yet, having done it, he was simply performing a statutory duty. The contract was beyond the power of either to make or enforce, and hence was ultra vires and void. No statute authorizes it, and the test is, what statute confers the right to act? and, unless so conferred, the act is void. Morehouse on Supervisors, page 3.

Resort has often been had to legislation in such cases. Laws 1866, p. 617, c. 278; Id. p. 995, c. 446; Laws 1867, p. 2308, c. 924; Laws 1863, p. 285, c. 171; Laws 1871, p. 35, c. 28; and Laws 1896, p. 307, c. 268—are examples of various methods and differing compensation by special legislative enactment in such cases. Both the Legislature and the board of supervisors are agents of the people. The Legislature may do what is not prohibited, while local officers may only do what is permitted. Morehouse on Supervisors, p. 3. It seems to me that the contract between Curtis and the board of supervisors was, therefore, ultra vires and void.

Counsel for the plaintiff claims that the audit of 1905, wherein the claim was rejected in toto, is final. "The powers exercised by boards of audit are judicial; but such boards are limited to the power conferred upon them by statute, and if they transgress these limitations their acts are void. Certiorari lies to review their action." Osterhoudt v. Rigney, 98 N. Y. 222. "An illegal audit can, of course, be attacked directly or collaterally, because it is void; but not so in case of an audit based upon a legal power to act, but which is erroneous as to some matter of fact or law." People ex rel. Smith v. Clarke, 174 N. Y. 259, 263, 66 N. E. 819. It is not necessary to the decision in this case to determine whether the audit wherein the claim was rejected was conclusive. We may concede it was conclusive until reversed by higher power. Claimant had the right of certiorari. This remedy he availed himself of, and it was a settlement of the pending certiorari proceedings which is claimed the basis of the resolution of 1906 auditing the

claim at the compromise figure of $5,470.94. I hold that the contract was ultra vires and void; that the action in rejecting the claim was compulsory by law upon the board.

The question still remains: May a void contract, such as this, become the basis of, and furnish consideration for, a compromise adjustment that shall be valid and binding upon the parties? It is not contended in this case but as between individuals this would be true; but it is contended that the principle that in upholding a compromise a court will not inquire into whether the claim is just or unjust, it being enough that it was disputed, does not apply to a municipal corporation. "It is asserted that a corporation has no power to compromise a contract it had no power to make. Moreover, a corporation has no power to compromise a contract which it had no power to make, unless it is to the extent of eliminating from it the illegal or unauthorized elements." Village of Ft. Edward v. Fish, 157 N. Y. 363, 373, 50 N. E. 973. In the Fish Case the water commissioners of the village of Ft. Edward were prohibited from selling bonds at less than the par value thereof. They sold for the face of the bond, without including accrued interest. The sale was for $50,000 face value, while with accrued interest the amount would be $50,444.44 par value; but the court has to cite and define authorities as to the meaning of the words "par value." The sale was held to be in violation of the statute, and absolutely void, because prohibited by law, and the court holds that neither party was bound thereby, and there was no valid claim by either as against the other. It was not simply void as ultra vires, but as a forbidden act. It is true this case is based by the court upon the principle of agency, and decides that the agents acted beyond their authority, which the purchaser was bound to inquire into, and was bound to notice the limitation of their power.

All men are presumed to know the law. They are presumed to know the law governing a public body and limiting its powers. In a broad sense the board of supervisors is the agent of the body corporate, the county, with powers defined by the statute, beyond which they may not go, and if they do, their acts are illegal and void. Compromise is a species of novation. Novation is derived from the civil law. "It is a condition that neither the original claim nor the subsequent agreement should be illegal." Green's Brice's Ultra Vires, p. 601. "It is only those who are capable of contracting that under the civil law may innovate, and those who cannot innovate themselves, such as prodigals, cannot make any novation, unless they thereby better their condition." Courts favor compromise. It is for the interest of the public that litigation cease. Every one is said to have the right to buy his peace. Broad statements as to the conclusiveness of a compromise in the absence of fraud are contained both in the cases and in the text-books; but none is broad enough to permit buying peace with another's money or with trust funds, and no agent without sufficient authority may compromise the rights of his principal.

Plaintiff insists that running through all the cases it will be seen that the claim itself must have had some legal foundation—be a claim that the board of supervisors have power to audit and pass upon at

some price. I hold with him that, to be the subject of a compromise in such cases as these, the original agreement must have some legal status as a claim which may be acted upon. The action is a statutory action. It is brought under the provisions of an act entitled "An act for the protection of taxpayers," and is brought to prevent any illegal act of the officers, agents, commissioners, and other persons acting for and on behalf of any county, town, etc., to prevent the waste of funds or property of said county, town, etc. I am unable to agree with the contention that even though the contract was void as made, and therefore no right under it could be enforced, and the claim is of necessity rejected in toto, nevertheless, a writ of certiorari being sued out (under which the judgment of the court, presumably, must be to the same effect), if a promise shall be made by the agents and trustees of the taxpayers, to wit, the board of supervisors, to compromise the certiorari proceedings, the amount of the claim being reduced more or less (and for the purposes of legality $10 would be as good as $1,000), in such case the taxpayers' money may be used under the guise of compromise to pay substantially the original debt, which was illegal and void. I am not cited to an authority going to that extent, or to the extent of upholding the compromise here made. I do not believe the principle to be sound or just, or that such law will be established by authority of the courts.

But it is said this is a great injustice to the claimant who faithfully performed his work under the contract. On the other hand, plaintiff claims that the price is exorbitant; that whereas 25 cents was the price for 100 names under the act of 1826, modified the next year to permit such additional compensation as the judges of the Court of Common Pleas would deem just, and 50 cents was inserted in the act of 1843, and the contract price between the board of supervisors of Monroe county and Wilson, who was then county clerk, was $1 per 100 names, while 6 cents per name, or $6 per 100 names in the contract, establishes that plaintiff has been fully paid, having received upwards of $8,000. He agreed to pay Wilé a commission of 10 per cent. Adequacy or inadequacy of Curtis' compensation is not germane to this inquiry. We must take the law and the facts as we find them and make our determination as we believe them to be. It is said in the Fish Case, supra:

"It is matter of great public concern to protect municipal corporations from the unauthorized and illegal acts of their agents in wasting the funds of their taxpayers. It is only with the utmost difficulty that municipal officers and agents can be kept within the bounds of their authority now; but, once let it go forth that an illegal contract can become the basis for a legal compromise entered into between the party and the agent guilty of the illegal act, and a new door will be opened to municipal spoliation. Sound public policy will not permit the courts to countenance this dangerous method of evading a statute; for it will always be open under the claim of good faith, and the fraud beneath will be hard to discover."

Active fraud is not charged, nor could it be proved. Fraud in its broad significance includes all acts and omissions which involve a breach of legal duty injurious to others. Adamson v. Union R. R. Co., 74 Hun, 3, 26 N. Y. Supp. 136. In People v. Board of Supervisors, 1 Hill, 367, Bronson, J., says:

"By charging the attorney with the duty of suing for fines without making provisions for the payment of costs, the Legislature had in effect declared that the salary of the officer is to be deemed the compensation for these as well as for other services. * * * Whether the pay shall be increased with the burden is a question which addresses itself to the Legislature. The courts have nothing to do with it. An officer whose compensation is fixed cannot rightfully claim anything beyond that. Any audit or allowance of any claims for which the county was not liable would be null and void for want of jurisdiction." Haswell v. Mayor, 81 N. Y. 255, 259.

To recapitulate:

1. I find that the work done by Curtis, he then being county clerk of the county of Livingston, was not the copying of old records, and was not within section 26 of the county law.

2. It was the making of new indexes, and so governed by section 265 of the real property law.

3. It was a duty imposed upon plaintiff, which, if he undertook at all, he must undertake under the provisions of the statute.

4. No compensation is fixed by statute for these services.

5. Defendant Curtis, then, being county clerk and a public officer, could receive no compensation for personal services rendered.

6. He was entitled by statute to reimbursement for expenditures incurred for materials and services, namely, stationery, books, etc., bought, and clerk's hire necessary, in the discharge of this duty.

7. That contract between Curtis and the board of supervisors was illegal and void.

8. No claim was created by it against the county.

9. There being no valid claim, the attempted compromise of the certiorari proceedings, and their audit of the claim at a less amount, is inoperative and void.

10. Plaintiff's cause of action is sustained by the facts and law of the case, and he is entitled to findings properly drawn and judgment thereon for the relief demanded in the complaint, with costs.